May it please the court, Mary Dowell on behalf of the appellants. I will try to reserve a few minutes for response at the end of my argument. We're here before you this morning on an immediate appeal from a preliminary injunction that was issued by the trial court in this case, but in the course of the proceedings virtually all the rest of the case is gone. The 12 v. 6 motion was granted by the trial court and the only cause of action remaining is the one that is really before you now, the issue of whether or not the former sexual harassment policy enacted by the Los Angeles Community College District and repealed and revised by it in 2007 was facially overbrought. It is a case that is vitally important not just to my client but to schools and colleges across California and it is indeed very timely in view of activities that are occurring even as we speak on college campuses in California. Even though the policy was repealed and revised in 2007, California Education Code section 212.5 still binds my client and binds colleges, schools and universities across California. So the issues that we see before you are two, but they seem to wind back and forth on each other almost like a Moebius strip. First, how can a definition of sexual harassment that is consistent with both state and federal case law and statute be challenged by a plaintiff who has not clearly alleged that he even wants to violate it? Is there a case in which the Education Code or something analogous was analyzed on a First Amendment basis in a public forum? Is there a case that has... Not in a public forum, Your Honor. The two cases that we have found where the Education Code section that we are concerned with here have had any constitutional attention at all are this Court's decision in Cohen v. San Bernardino Valley Community College District and a state law case that we cited to you, Granowitz v. Redland School District. And neither of them applied any sort of forum analysis to it. Okay, and neither of those cases is really on point with the issues raised here. They are helpful, I think, to the analysis here, Your Honor, but they are not directly on point indeed. No, we have found no case law that would support a conclusion that a definition of sexual harassment, and this is really the second issue, that this definition, which focuses on conduct and which has been applied successfully without confusion for over 20 years, could suddenly be determined to be overbroad when examined in the context of student expression. Well, why is that? I mean, isn't the analysis, at least for the EEOC language, which the Education Code is similar to, is applied in an employment situation? And here we are in a university situation where the Supreme Court has said the First Amendment rights of students are protected even more than the average people on the street because of the academic freedom context. Why should what is okay or appropriate in an employment context be the same in a public forum in a university context? Your Honor, I think that what has been judicially determined to be appropriate in an employment context has been incorporated by the federal courts in discussions of Title IX. And so when you see a – we both have talked to you about the Davis case and the extent to which Davis cited to Meritor Savings Bank in articulating the contours of what will constitute a claim for a violation of Title IX in the school setting. So I think it is appropriate for us to look at the way that definition has been applied in the employment setting, and I think it is appropriate for us to consider the success with which that definition has applied in the employment setting. And I think that's what the California legislature considered when it incorporated that employment standard into a statute that has nothing to do on its face with employment, but rather articulates the right of students in schools and colleges in California to be free from sexually harassing conduct by both employees and peers. I don't think you argued to the district court that the definition that was given to that language in Davis was the narrowing construction that the university adopted for the 1995 policy. Is that right? I think you said, well, we don't know. Whatever you said was good. Your Honor, I believe that we did argue to the trial court that the definition contained in the district's policy and contained in the education code is subject to a narrowing construction and that the court considered and discussed in its decision regarding the preliminary injunction whether it was subject to a narrowing construction or not. But you didn't argue Davis. Is that right? I don't recall specifically articulating Davis as the basis for a narrowing construction. And as you know, I was not counsel at the time that the matter was actually orally argued. Using you for your client as well. Are you arguing now in your client, are you arguing now that Davis is the appropriate interpretation and that that would pass a First Amendment? Well, Your Honor, it has been urged on you by opposing counsel that Davis constitutes the required construction such that the definition of sexual harassment must be revised to reflect what is stated in Davis. I disagree with that. I don't believe that the definition must be revised. Davis is a judicial interpretation that certainly provides a framework, however. And I do believe that Davis, that Education Code Section 66301 and other judicial determinations allow a narrowing construction to be applied to the definition that the district had in its prior sexual harassment policy and that exists in the code. Well, we have this case, Ellison, which basically said if you get a creepy letter from someone, then that can be sexual harassment if you're concerned. I mean, would that be an appropriate definition in a university context? Your Honor, the Ninth Circuit's decision in Ellison v. Brady is definitely one of the judicial determinations that has helped frame application of sexual harassment principles of law. I think that Davis, in articulating what the contours of liability for a school district under Title IX, was aware of Ellison v. Brady. The language is too close for it not to have been part of that jurisprudence. So, yes, I think that this Court's jurisprudence with Ellison does act as part of that limiting construction. My point is I don't believe that the college was required to rewrite its sexual harassment policy after this Court decided Ellison v. Brady in order for that policy to escape being struck down on the grounds of overbreadth. Counsel, Ms. Dowd, Judge Gould with a question for you. Do you agree that First Amendment rights are at an apogee or, you know, at their highest level when we're dealing with the rights of students on a college campus? I'm not sure that I agree they are at their apogee, Your Honor. There are probably even higher concerns when we're talking about a true public forum and the expression of ideas in a true public forum. But I do agree that the Supreme Court's jurisprudence and this Court's jurisprudence affords a very high level of protection for expression on a college campus. I think that it's important to bear in mind what the United States Supreme Court has said and what I think that this Circuit has been aware of. Even when you look at perhaps the seminal case of them all, Tinker v. Des Moines School District, Tinker says that a school district can regulate student speech under two circumstances. That is, where the speech would impinge on the rights of other students and where the speech would result in substantial disruption of or material interference with that school activities. And I think we need to pay attention to that first prong, that is, the concern that the speech not impinge upon the rights of other students. But isn't Tinker as a high school case where there's still the in loco parentis aspect of it and in Healy and other Supreme Court cases, the Supreme Court has indicated that the Tinker standard may not apply or does not apply to protect the rights of adults in an academic setting. Your Honor, I don't read Healy as saying that Tinker does not apply in a college setting. And I think that it has been cited broadly enough and often enough by the United States Supreme Court and this Court to give us some lesson in what the balancing needs to be, even in a college setting. And where you have the circumstances, as my client does, where there is a state statute that requires it to implement, to develop and implement a policy regarding sexual harassment, and this is an obligation that is reinforced by Title IX, then we know that we have in that collegiate setting the rights of other students, which we need to be careful not to impinge upon in the exercise of free speech. And one of the things that is difficult about this case is that you have here a plaintiff who did not do anything that really implicated that policy and nobody ever accused him of doing anything which really implicated that policy. So we really are talking in theoreticals. Well, I mean, there was the opposing counsel points to Mr. Professor Madison, I guess, statements. So there was some, there was in the atmosphere. But let me go back to this question about Tinker because I'm concerned about it. And you talk about impinging the rights of other students. You're talking about something beyond impinging the rights. You're talking about offending them because the language on his face talks about offense. And that, as one of the courts says, that's a feature of the First Amendment is that it's offensive. It's not a bug in the First Amendment. So how can just offensive speech impinge on the rights if it isn't actually driving people out of school, which I guess is what Davis was saying. I think we have to really read the language of the former policy very carefully, Your Honor. What it really, because it doesn't just say you can't engage in speech that is offensive. That's, I think, an overstatement. It focuses on, what it specifically says is that sexual harassment is unwelcome sexual advances, requests for sexual favors, and other verbal, visual, and physical conduct of a sexual nature. So it's not just talking about a statement that might offend someone. It's talking about conduct of a sexual nature. And that was certainly not alleged to have been engaged in by the plaintiff here. And there's no evidence that he tried to engage in that sort of conduct to talk about sexual matters, to describe sexual activity, to even decry sexual activity between homosexuals. He alleges in his complaint that what he is moved to do by his Christian religion is to share his religion with other people. He alleges that his informative speech related to God and miracles, and that he did in the course of that speech talk about homosexual marriage and read some Bible passages. But he doesn't allege that he was making statements that were of a sexual nature. So is it your position that speaking against homosexual marriage is not speech of a sexual nature? Your Honor, I don't see how that speech could be construed as conduct of a sexual nature, particularly as these principles have been articulated and enunciated in Davis, in Ellison v. Brady, and Meritor Savings Bank. I don't think, and no one ever accused him of having done so. There is no evidence on the record that anyone ever characterized it as having been sexual in nature. I'm conscious that if I'm going to reserve any time, I should pause now. Thank you. Good morning, and may it please the Court. David Hacker for Jonathan Lopez. No court has ever upheld the constitutionality of a college policy similar to the one in this case. In fact, two circuits, the Third Circuit in Dijon and the Sixth Circuit in Danbro, both found similar policies overbroad and affirmed injunctions against them. Go ahead. Why is that subject to a narrowing construction? Why isn't the district court in not saying, I read this policy per the education code, per the EOC regulations, per Davis, as really being the sort of offensive conduct and speech that drives people out of the school? Well, there's two answers to that, Your Honor. The first is that the college's policy specifically says that its definition of harassment is separate from federal and state law definitions. There's a disjunctive clause in the policy language. In addition to that, the college has really offered no narrowing construction. Their proposal is that its policy be read in conjunction with California law, some of those laws which don't even apply to students. But that doesn't provide students with notice as to what is permitted and prohibited on campus. To say that students cannot engage in this type of harassment unless it's protected by California law is something that students simply wouldn't know what that means. And that's what the court in College Republicans astutely noted, is that judges and lawyers debate regularly what the First Amendment protects. So imposing some sort of narrowing construction that the policy should be read under state law really is no narrowing at all and leaves overbreadth. And that's something that the judge... Mr. Hacker, it's Judge Gould with a question for you, please. Are there any precedents of the Ninth Circuit or the Supreme Court that explicitly address whether a narrowing construction can be an appropriate answer to an overbreadth challenge? Well, Your Honor, I know that narrowing is something that the court must engage in if it is possible. However, the court does not have to read into the policy or rewrite the policy as the district court found. And I guess what's bothering me is I thought that part of the basis for the whole overbreadth doctrine was the concern that an overbroad policy would chill speech of the people who read it. So it sort of seems like a puzzle to me to say, well, if you narrow the policy by construction, now it's not overbroad. Because why wouldn't the students think they have to follow it without narrowing it? Well, if we attempt to narrow it, the students are not going to necessarily understand that, as the college argues, that if we narrow it under California law, that their speech will be protected in certain circumstances and not. And it's important to note that the college's policy really cannot be narrowed because the way that it describes its policy in the five different websites and policy locations is that it says if you engage or think you might engage in offensive speech, you should not say it. And the Dijon court looked at narrowing, and it found that a virtually identical policy couldn't be narrowed because it still was overbroad and swept in a substantial amount of protected speech. Even taking the purpose language out of the policy, it still said there was too much protected speech that was implicated by the policy. And so that's why it pointed to the Davis case, like Justice Alito did when he was on the Third Circuit in Saks, and found that both of those policies simply could not be narrowed because they still prohibited a substantial amount of protected speech. Let me ask you a little bit different line of questioning. It's not my understanding, I guess, that the November 24th incident is a disciplinary proceeding under your argument, correct? No, it was not a disciplinary proceeding, Your Honor. And I don't think anybody's argued that you or that your client violated this 95 policy in his speech in class. I haven't seen any of that in the briefing. There's been no specific mention of it, Your Honor. So what evidence do I have that his behavior at all triggered anything to do with this policy? Well, Professor Madison did threaten him. But Professor Madison isn't the school. In fact, Professor Madison was disciplined by the school, and your client got an A. So what evidence do I have that your client ought to be able to challenge the policy at all? Mr. Lopez, just by virtue of the fact that he is a student, may challenge a policy that regulates his speech on campus. Under what doctrine would he challenge? Wouldn't I be really looking for the doctrine where he's got to challenge this under some policy such that he would need to make, well, under California Pro-Life Council v. Gettman, we're really looking at the second prong, then, of that particular case in order to challenge? Are you talking about standing based on third parties? Right. Yes, he does have standing on that ground. Well, aren't we really then looking at if the statute must clearly fail to cover his conduct, or if a statute clearly fails to cover his conduct, that such a fear would not be credible? What credibility does he have in this particular situation that he would be subject to this policy at all? Well, he does have a credible threat. What is the credible threat? The policy says that students who do not comply with it will be subject to anything up to and including expulsion. Well, but the policy itself says that, but I guess I have to look at the conduct that is allowed in the policy itself and what conduct is there, and I have to see if there's anything here which would suggest that he would be subject to the policy being used against him for what he did. Well, certainly the students in his class and Professor Madison both thought that they could report him for engaging in offensive speech. And remember, the policy is not... Well, but Professor Madison didn't say anything about this particular 95 policy at all. Right, and he doesn't have to, Your Honor, because... I mean, in fact, his whole thing was a student conduct, code of student conduct, which I don't think has anything to do with the 95 policy. It does, Your Honor, because the student code of conduct requires that students abide by all policies and rules issued by the district and the college. So no matter whether Mr. Lopez is in class or whether he's with his friends or even off campus, if he engages in speech that is offensive to others or, as the policy defines it, generalized sexist statements or attitudes or comments that are insulting, that speech can be reported and prohibited. Go ahead. Don't I have a policy right in the language which says, The discussion of sexual ideas, taboos, behavior, or language, which is an intrinsic part of course conduct, shall in no event constitute harassment. Recognized essential function of education is probing of received opinions and exploration of ideas. I mean, my worry is that we're letting a young man who was offended by what happened in class, and justifiably so, and the school district comes in and says, This teacher shall be disciplined. The young man gets an A and now wants to, on a totally different situation, come in and attack a policy that I can't find was even used against him. Well, two points to consider, Your Honor. And the first is that that section that you just read from only applies to class and potentially could still be ignored by the college based upon its policy language. But the only injury we have in this case was self-imposed. Isn't that correct? No, Your Honor. I mean, nobody else told him he had to do anything else. The college disciplined this professor. Well, that is the college's allegation in one of their declarations. But the policy, just like Dambro, just like Dijon, Sachs, and Baer, in each of those situations, students challenged a policy that regulated their speech on over-breadth grounds, and on the same factual statements from those students in their complaints and in the facts of those cases, they had standing to challenge that policy. But why is it this case like Morrison? Morrison is, first of all, an outlier because it would conflict with Dambro. And Dambro is closer on the facts to this case. They're both from the Sixth Circuit. And Dambro involved a college harassment policy challenge by college students. Morrison, on the other hand, and the only thing on appeal that was relevant or looked at by the court, was an as-applied challenge asking for damages. And in addition, the Morrison case, the high school there, did change its policy during the litigation to comply with and protect the students' First Amendment concerns. So Morrison's really an outlier and does not stand up with or even abide by Supreme Court or this court's precedent. The... The college says that the speech that Mr. Loeb is engaged in wasn't the sort of sexual speech that is banned by the policy. Well, of course they're saying that now. I mean, that's their interpretation during litigation. If we look at the text of the policy, it tells students, if you think you might say something offensive, don't say it. If you might have an offensive or degrading attitude, that can be punished. It says if you create an offensive environment, however subjective that might be to any person, and in fact the people that were in Mr. Lopez's class proved this, that can be punished under the policy. The mere fact that Dean Allison Jones chose not to punish Lopez in this circumstance doesn't mean that another administrator has the appropriate guidance in this policy to do the same thing. In fact, it could have gone the other way very easily under the terms of the policy. I'd like to address another standing point, Your Honor, and that is that even if Lopez was not actually threatened with punishment under the policy, he still has standing to seek pre-enforcement review, and that was the holding of the Supreme Court recently in Citizens... The pre-enforcement review still brings him back to the same old standards that we have in any one of the standing policies, which are the same standards. And again, here we are. Really, we're looking at a young man who was never challenged with the policy, never disciplined at all, and now comes in based on language that may not even be the policy. It may be conduct. It may not be language at all. And now we're going to say he has standing to challenge. And he certainly does because the policy's terms, which do prohibit verbal expression, implicate his speech. Just like when he got into the speech class and talked about his views on marriage and biblical issues, he can express his views on issues of biblical issues of gender roles and sexuality. That would be implicated by the policy. And it's simply of no concern that the policy has never been applied to him. In a facial challenge, that's not the standard. As this Court has held in Food Not Bombs, a plaintiff or litigant who wants to engage in speech but feels chilled by the policy or the ordinance at issue has standing to challenge it on its face. That chill is sufficient. Are we going to – will you agree with me that really you're only raising the facial challenge here? Did I get any argument really about an as-applied challenge? Well, we did raise that, and we – I didn't see any argument really about that, did I? Well, we raised it in our brief because we raised it below, Your Honor. But clearly the main thrust of what the defendants or the college is challenging is that of the facial challenge. So if we only really have a facial challenge in front of us, if we're really going to look at it applied, we may ought to send it back to the district court to make a first determination on that, hadn't we? No, Your Honor, because the district court – Did the district court address an as-applied challenge in his decision? No, he specifically said he did not. And if an as-applied challenge is to continue, the proper remedy here would be for this court to affirm the injunction on the facial overbreath challenge and then allow the parties to go back to the district court. Remember, this is only a preliminary injunction, and it's clear that the district court did not abuse its discretion in issuing the injunction, considering that the policy was published in five different locations and restricted Mr. Lopez's speech in a number of ways. So we would ask that the court affirm the injunction and also affirm the court's denial of the motion for reconsideration. Unless there are any further questions. Thank you. Very briefly, if it pleases the court. I know I can't add too much to what we've already argued with respect to the standing. I do think that it is correct to say that this plaintiff has not met the standing required by this circuit or any other circuit, and that this case is very much more than that. Even in the Bayless case that this court decided, it requires that the plaintiff must intend to engage any course of conduct arguably affected with a constitutional interest, and two, there must be a credible threat that the challenge provision will be invoked against him. And we believe that the plaintiff here has not met that standard. But to the extent that the court does move to the issue of the overbreadth of this issue, first of all, we do urge you, as we have in our briefs, not to follow the lead of the Third Circuit in Dijon, because the Dijon court really was looking at a policy that had some significant differences in it. It was deeply influenced there by the presence of language that did not apply. We think this is subject to a narrowing construction, and particularly that the California courts would view the 212.5 language as narrowed by Education Code section 66301. Thank you. The case of Lopez v. Candelli is submitted. We thank both parties for their excellent argument.
judges: Gould, Ikuta, Smith N. R.